

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Mary Lou Dunn,                    :    Case No. 1:03CV2304
                                  :
    Plaintiff             :
                                  :
    v.                    :    Magistrate Judge David S. Perelman
                                  :
City of Brook Park,               :    **MEMORANDUM OPINION**
                                  :
    Defendant             :

      Plaintiff, Ms. Mary Lou Dunn, initiated this action against the defendant alleging that she

suffered sexual discrimination including harassment, retaliation and a hostile work environment, in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2(a)(1) and the

Ohio Civil Rights Act ("OCRA"), Ohio Revised Code §4112, et seq.[1]  It is now before the Court

on the motion of defendant, the City of Brook Park ("City") for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure.

      The plaintiff was hired in 1988 as a safety dispatcher with the City, and as a member of a

collective bargaining unit she was subject to the terms of a collective bargaining agreement.  As a

dispatcher she received emergency calls directed to the City's Police and Fire Departments, as well

as those directed to emergency services and animal wardens, via three 9-1-1 dedicated phone lines,

---

[1] Although plaintiff also included an allegation of violation of public policy, she concedes in her briefing "that summary judgment is appropriate on her public policy claim."

AO 72A
(Rev. 8/82)

seven Police Department phone lines, three Fire Department phone lines and separate radio systems for the Police and Fire Departments. Upon receiving those calls dispatchers would convey the information to the appropriate department, and then communicate an appropriate response to the callers. A dispatcher's job also required clerical and record keeping skills, and at times dispatchers were required to serve as matrons for female prisoners in the City's jail.

After twenty years under the administration of Mayor Tom Coyne, in January of 2002 Mayor Mark Elliott was elected and put his administration into place. He appointed Mr. Michael Von Duhn as the new Safety Director, responsible for supervision of the safety dispatchers among other duties.

In November of 2002 Mayor Elliott appointed Mr. Kevin McQuaid as the new Chief of Police. At that time City ordinances were changed so that Chief McQuaid was given control over the dispatchers, although Safety Director Von Duhn retained administrative supervisory duties for the dispatchers.

On or about July 3, 2002 Patrol Officer Robert Sofchek witnessed an incident in which plaintiff, while working as a dispatcher, "became upset and began to yell at a dispatch trainee." In an attempt to diffuse the situation, Officer Sofchek took over for her and told her to take a break. Upon learning of the incident, Safety Director Von Duhn directed Dispatch Supervisor Robin White to investigate the incident. She later informed him that plaintiff denied that the incident had occurred. Safety Director Von Duhn decided not to pursue the matter further after considering the following factors: (1) he thought that this might have been an isolated incident; (2) he did not want to cause problems between plaintiff and Officer Sofchek; and (3) it was clear that this incident aside, the dispatch trainee would not have satisfied the requirements of her probationary period.

On or about July 5, 2002 plaintiff raised the issue which she now claims caused the City to

2

retaliate against her, when she complained to Safety Director Von Duhn that she believed that the practice of paying male patrol officers field training ("FTO") pay while at the same time not paying female dispatchers and police officers FTO pay was discriminatory. At about the same time, the City's Director of Finance notified the new administration that the City was paying FTO pay to dispatchers and police officers despite the fact that it was not provided for in any CBA, and that the payments would be stopped. The City informed the representatives of the police and dispatchers' unions about the improper payments and instructed them to submit letters of understanding which would supplement the respective CBAs in order to make FTO pay retroactive to January 1, 2002.

Plaintiff suffered another emotional outburst on September 17, 2002, which she described as an "overload" or "breakdown," while she was the sole dispatcher on duty. Patrol Officer Michael Tornabene, who was booking a prisoner near where plaintiff was working, heard her "crying and yelling so loudly" that he stopped what he was doing, went to plaintiff to investigate, found her to be incapable of continuing to work, told her to "go have a cigarette," and took her place as a dispatcher until he was relieved by Lieutenant Timothy Hall who had heard the commotion from another floor and went to investigate. Lieutenant Hall ran the dispatch center until plaintiff returned about 30 minutes later.

In a letter dated September 23, 2002 from Police Chief Thomas A. Dease to Safety Director Von Duhn the chief stated that he felt it to be "imperative that Dispatcher Dunn be referred for Medical Evaluation, due to her emotional outbursts, which keep getting worse." He also expressed concern that she might harm herself or others, and noted that she had been "warned about her attitude not only with other employees, but with citizens requesting assistance."

In response, Safety Director Von Duhn decided that "a softer approach would be more

3

helpful," and he, along with Human Resources Director Lisa Zamiska, provided plaintiff with "information and alternatives for free counseling services." He also scheduled the dispatchers to attend stress management classes, but they were subsequently cancelled. Since that time, however, he has continued to send dispatchers to those classes when they become available.

In October of 2002 the Union representatives on behalf of the police officers submitted the requested Letter of Understanding to supplement the CBA with the City to make FTO pay retroactive to January 1, 2002. Mayor Elliott executed that Letter of Understanding shortly after receiving it.

On or about October 23, 2002 plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), in which she alleged gender-based discrimination consequent to the payment of FTO pay to male police officers but not to the all-female group of dispatchers.

It was not until November of 2002 that the dispatcher's Union filed its Letter of Understanding to supplement the CBA with the City to make FTO pay retroactive to January 1, 2002. Mayor Elliott waited to execute the Letter of Understanding until he sought the advice of the legal department as to whether the pending OCRC charge would be adversely affected by doing so, but eventually signed it in December of 2002. Shortly thereafter, the discrimination charge was resolved.

Plaintiff's problem with emotional outbursts appeared again on October 25, 2002 when she accused fellow dispatcher Lisa Buck of leaving her alone for too long while on break during a busy time. Plaintiff went onto the "all call" or intercom system that could be heard throughout the station to demand that the other dispatcher return, during which she yelled, "This is fucking bullshit!" Dispatcher Buck requested that disciplinary measures be taken against plaintiff, which caused Safety

4

Director Von Duhn to investigate the incident.

Although plaintiff admitted to using the profanity over the all call system, Safety Director Von Duhn decided that instead of disciplining plaintiff he would send her to counseling. He informed her of that decision in a meeting she attended on October 28, 2002 along with Human Resources Director Zamiska, Lieutenant McQuaid, and Union Steward Walentik. It was agreed that plaintiff would not attend the City's Employee Assistance Program ("EAP") for counseling, as it was her preference to be counseled by her own therapist, which the City allowed provided that the therapist provided proof of counseling sessions and worked with the City on the identified issues.

On November 6, 2002 Safety Director Von Duhn requested from plaintiff proof that she had been attending counseling, but she had nothing to give him until the following day when she gave him a note captioned "Certificate to Return to Work." Having found that note to be insufficient evidence that she had attended counseling, Safety Director Von Duhn requested that the Human Resources Department begin the paperwork for formally referring plaintiff to the EAP to receive counseling. Once again, however, at the plaintiff's request the City permitted the plaintiff to be counseled by a therapist of her choosing without proceeding through all the formal steps of the EAP, provided that the therapist supply the City with "documentation of compliance with all treatment recommendations as well as treatment information that was pertinent to her job duties and responsibilities." Human Resources Director Zamiska directed a letter to plaintiff's therapist outlining the foregoing and requesting further information.

In a handwritten note dated November 13, 2002, Dr. Cynthia McGuinness of Cornerstone Psychological responded to Ms. Zamiska stating that she had met with plaintiff on two occasions and planned to do so on a weekly basis for at least three months "regarding issues resulting from her

5

stressful work environment."

Safety Director Von Duhn directed a letter dated November 26, 2002 to Dr. McGuinness outlining for her the incidents of emotional outbursts which caused the City to require plaintiff to seek counseling, and carbon copied the letter to plaintiff, Mayor Elliott, Ms. Zamiska, Chief McQuaid, and Union representatives Jim Budzik, Allyson Walentik, and Erin Andrasak.

Based upon the foregoing letter, plaintiff filed a Step 3 grievance against Safety Director Von Duhn (having bypassed Steps 1 and 2 of the grievance procedure in the CBA) in which she alleged that by sending copies of that letter to the parties listed the safety director "breached and violated any privacy and confidentiality that is guaranteed by the City of Brook Park[,]" and that he harassed her. That grievance was denied by the City in a memorandum dated January 17, 2003 from Mayor Elliott to plaintiff and her union representative, in which he stated that the grievance was denied for procedural default in that it was filed beyond the prescribed time period for doing so (1 week after the act complained of) and that the required first two steps of the grievance procedure were bypassed, and upon the merits in that there was no evidence of harassment and "the City could have sent Ms. Dunn to the City's medical counselor/personnel rather than permitting her counselor to submit documentation."

In a letter dated January 13, 2003, Ms. Zamiska again requested that Dr. McGuinness provide "continuing documentation of compliance with all treatment recommendations as well as treatment information that is pertinent to job duties and responsibilities." No such documentation was forthcoming prior to filing this case.

In either March or April of 2003, while in the dispatch center Safety Director Von Duhn noticed that plaintiff was unable to read numbers from a driver's license and overheard her ask one

6

of her co-workers what the numbers were. As a result, he directed her to have an eye examination. She was examined at the Cleveland Eye Clinic and it was determined that she needed surgery to remove a film which had grown over her eyes consequent to previous cataract surgeries. She had the surgery, the costs of which were covered by her insurance and by the City.

Plaintiff filed a second OCRC/EEOC charge on April 5, 2003, alleging that the City's October 28, 2002 decision to send her to counseling constituted retaliation for the filing of her first OCRC/EEOC charge. Although she alleged in the Charge of Discrimination that she had filed her previous discrimination charge in September of 2002, the former discrimination charge was signed by her on October 20, 2002 and was stamped by the EEOC as "received" on October 23, 2002. The Notice of Charge of Discrimination which was then directed by the EEOC to Mayor Elliott was dated October 31, 2002 and, according to the deposition testimony of Mayor Elliott, Safety Director Von Duhn and Ms. Zamiska, was not received until at least November 1, 2002.

In a letter dated April 16, 2003, written by plaintiff to Mayor Elliott, Safety Director Von Duhn, and Law Director Lambros, she accused Police Chief McQuaid of harassing her as illustrated by several incidents: (1) his refusal to give her permission to wear pants which were not on the uniform clothing list, despite the fact that he permitted at least two other women to wear non-uniform pants; (2) he "criticized" her performance by suggesting that she should state her name when answering the phone; and (3) he used a "stern critical tone" when speaking to her after she directed to his voicemail a call from a judge. Her complaint was investigated by Ms. Zamiska and Ms. Victoria Cardaman, who interviewed plaintiff, Chief McQuaid, and Sgt. Jim Stopiak, and they determined that there was no support for plaintiff's allegations against Chief McQuaid.

During April, Chief McQuaid continued to be dissatisfied with the failure of dispatchers to

7

follow proper call procedure as had been detailed in a written memorandum which included a screening process allowing him and other management staff to prioritize calls. He instructed Sgt. Stopiak to remind the dispatchers of the procedure, which he did, after which it was reported to Chief McQuaid that plaintiff responded by saying something about how she "was not a secretary."

Also in late April, a city resident complained to Safety Director Von Duhn that she had been treated rudely by a dispatcher during a call she made several weeks earlier to the police department. Safety Director Von Duhn removed himself from the investigation due to the fact that plaintiff had previously filed a grievance against him, and sent the matter on to Chief McQuaid. The chief requested that Sgt. Stopiak investigate the matter and report back to him. Sgt. Stopiak did so by listening to recordings of calls during a time period identified by the complainant citizen, in which he not only determined that plaintiff was the dispatcher who had offended the citizen but also found several other violations of departmental rules and regulations by plaintiff, which he identified in a written report to Chief McQuaid dated April 28, 2003. Chief McQuaid then confirmed the findings of Sgt. Stopiak by listening to recordings of calls from the complaining citizen and other calls surrounding the date of the incident.

On or about April 29, 2003, Chief McQuaid reprimanded plaintiff in writing for failing to follow proper procedure in checking information provided in a call on April 16, 2003, which failure caused her to dispatch a patrol officer to a wrong location.

On May 6, 2003 the City issued to plaintiff a Notice of Disciplinary Action for a one day suspension resulting from her violations of numerous work rules and procedures in handling

8

AO 72A
(Rev. 8/82)

telephone calls.[2]

Having received no response to the January 13, 2003 letter from Ms. Zamiska to Dr. McGuinness requesting further documentation regarding plaintiff's counseling, plaintiff was formally referred to EAP on May 8, 2003.

Less than a week later, on May 12, 2003 plaintiff informed the City by way of a "Disability Certificate" signed by Dr. Terrence W. Scanlon, that she intended to take three months of disability leave,[3] effective the following day. It was not until May 26, 2003 that Dr. Scanlon provided the basis of the disability as being that she suffered from "anxiety and depression." The City approved leave until August 12, 2003.

During her leave, on July 8, 2003, Mr. Bob Hoopingarner, Operations Supervisor with EAP, recommended that plaintiff continue in counseling with her therapist, have psychological fit-for-duty testing, and after such testing had been completed she send the results to a psychiatrist who would then use them in assessing her to determine whether she was able to return to work.

In a letter dated July 16, 2003, Ms. Zamiska informed plaintiff of Mr. Hoopingarner's recommendations, and that she had made an appointment for plaintiff on July 24, 2004 with Dr. Paul Josell for psychological fit-for-duty testing. She included a waiver to be signed by plaintiff so that Dr. Josell could access "pertinent information."

In another letter dated August 11, 2003, Ms. Zamiska informed plaintiff that she had been scheduled for an appointment with Dr. Edward Meyers, a psychiatrist. Dr. Meyers was sent the

---

[2] After proceeding through the grievance and arbitration procedure set forth under the CBA, in January of 2004 this discipline was reduced to a written reprimand.

[3] The leave was requested pursuant to the Family and Medical Leave Act ("FMLA").

9

testing results obtained by Dr. Josell in order to make his assessment.

When, during his investigation of complaints regarding plaintiff's telephone demeanor and inaccuracies, Safety Director Von Duhn listened to the taped recordings of calls handled by plaintiff he "heard [plaintiff] ask callers to repeat themselves or speak up countless times." Based upon his experience with family members who became irritable in conjunction with hearing problems, he wondered whether her problems with emotional outbursts could have been linked to hearing loss. As a result, the City directed plaintiff to have a hearing evaluation, which she did with Mr. Richard Reikowski, a Clinical Audiologist with the Cardinal Union Hearing Center.

In a letter dated August 11, 2003 from plaintiff to Ms. Zamiska she informed the City that Mr. Reikowski found her to have a hearing loss for which he recommended hearing aids in both ears, and she requested that "the City of Brook Park render accommodations under ADA provisions." Her administrative leave time was extended until accommodation for her hearing loss could be addressed.

Mr. Reikowski confirmed his findings in a letter to the City dated August 12, 2003, in which he stated in pertinent part:

> [I]t is my professional opinion that Mary Lou Dunn does in fact have a bilateral hearing loss. This hearing loss, if not addressed, could cause significant problems for both Mary Lou and callers requiring assistance. Her hearing tests show a definite need for hearing instruments. Without the use of hearing instruments Mary Lou could easily miss important information being told to her by co-workers or callers in distress. I would recommend that Mary Lou not resume her duties as a Dispatcher until her hearing problem is addressed. Hearing instruments will provide for her the needed improvement of her hearing loss to appropriately compensate for work related hearing difficulties.

Mr. Reikowski also submitted a written quote of $2600 for hearing aids for plaintiff, to which the

10

City agreed, and she received those aids.

Plaintiff saw Mr. Reikowski again on October 1, 2003 for a follow-up fitting of her hearing aids, which caused him to state in a letter to Safety Director Von Duhn dated the following day that "Mary Lou is performing up to appropriate abilities and she should be able to perform her work duties immediately with the use of her new hearing devices." Plaintiff was taken off administrative leave as of the date of Mr. Reikowski's letter and returned to work, subject to the condition that she wear her hearing aids in order to make her fit for duty.

Upon her return to work plaintiff began to complain about being required to wear her hearing aids. In response, Safety Director Von Duhn told her that if she was able to obtain a professional opinion that Mr. Reikowski's findings were incorrect and that she did not need hearing aids in order to be fit for duty, he would revisit the issue. Plaintiff sought another opinion from Ms. Lori Gallion, a Certified Audiologist with the Cleveland Ear, Nose, Throat & Allergy Center, who confirmed that plaintiff suffered a hearing loss, albeit a mild one, but she would "not make a determination regarding how the hearing aids benefit her hearing." She recommended "some type of assistive listening device (ALD). An amplified telephone is an example of an ALD[,]" and that plaintiff continue to have her hearing aids serviced by the Cardinal Union Hearing Center.

Plaintiff failed to have the hearing aids serviced, but did have them adjusted on October 7, 2003. She did not return to see Mr. Reikowski until July 13, 2004.

On November 12, 2003 plaintiff filed the instant lawsuit, while continuing in employment with the City.

In a letter dated November 18, 2003 to Safety Director Von Duhn, plaintiff stated her opinion that wearing the hearing aids would interfere with the performance of her job and that "if forced to

11

wear them by the City of Brook Park, I will not be held responsible for any harm that could come to other employees or citizens of Brook Park." She further requested that every other dispatcher and officer working in the dispatch area be given a hearing test.

The safety director responded in a letter several days later by noting that the plaintiff had requested accommodation, that the City had complied with her request by providing her with hearing aids, and that having so complied the City should not be required to provide another type of device merely because she did not like that which she already received. He further stated that the other dispatchers/officers would not be tested unless they showed signs of having hearing problems, as she had, and that even if they were scheduled for testing, as a co-worker she would not be privy to that information. He also confirmed that any mistake she made would be "thoroughly investigated, as it would be with any other dispatcher." Finally, he stated that he was "getting tired of this paper chase game[,]" and requested that she "just do [her] job."

In a memo dated February 10, 2004 plaintiff was reminded by Sgt. Stopiak that she was required to wear her hearing aids in order to be considered fit for duty and that she should, therefore, have them with her and wear them whenever she was on duty.

On June 30, 2004 plaintiff was released as "unfit" for duty for having reported to work without wearing her hearing aids and, when confronted, having stated that she did not have them with her. She was informed by Sgt. Stopiak that "reporting to work without properly wearing [her] hearing aids" would render her unfit for duty. When deposed, the plaintiff admitted that she had her hearing aids in her purse that day, but chose not to wear them.

Despite having been sent home as unfit on that occasion, on July 3, 4, 5, and 6, 2004 plaintiff reported to work without wearing her hearing aids and was sent home as unfit. Again, she admitted

12

having had the aids with her on those days but chose not to wear them. As a consequence, Chief McQuaid notified her in writing on July 7, 2004 that it was proposed that she be suspended for three days without pay for "insubordination and/or neglect of duty for failing to wear the hearing aids[,]" and informed her that continued refusal to do so would result in "greater disciplinary action."

A pre-disciplinary hearing on the charges was held on July 9, 2004, attended by Mayor Elliott, plaintiff and her union representatives, during which the parties engaged in negotiations that yielded a settlement in which they agreed that the City would send plaintiff for another examination to be performed by a medical doctor in order to determine whether she needed to wear hearing aids in order to be fit for duty. It was further agreed that if the physician found that she needed the hearing aids to be fit for duty, then wearing them would be a condition of her continued employment, but if the physician found that she did not need hearing aids her suspension would be reduced to a written reprimand for insubordination and she would be reimbursed for July 3, 4 and 5, 2004, with other time off to be deducted from her leave balances or taken as unpaid leave. It was also agreed that "Dunn and the Union agree not to file any further grievances or administrative charges related to any matter set forth in this Settlement Agreement." Representatives from the union and the City executed the Settlement Agreement.

The consulting physician concluded that plaintiff did not need hearing aids in order to be considered fit for duty and, as had been agreed, her discipline was reduced to a written reprimand and the requirement that she wear hearing aids as a condition of employment was removed.

On July 29, 2004 plaintiff filed a grievance to have the written reprimand removed from her employment file and to have her sick time restored. Based on the terms of the Settlement Agreement, the City dismissed the grievance and the Union did not pursue the matter further.

13

The defendant argues that summary judgment should be granted in light of the plaintiff's failure to either offer direct evidence of sexual discrimination or to satisfy the requirements of a prima facie case of sexual discrimination, including harassment, hostile work environment, and/or retaliation.

Plaintiff counters that there is at least a genuine issue of material fact as to the following: (1) that she suffered a hostile work environment as evidenced by the fact that she was required to "undergo repeated psychological examinations, testing, and counseling when no other employee [was] required to do so[;]" and (2) that she provided direct evidence of retaliation by demonstrating that she challenged the City's FTO payment plan and the was required to attend psychological counseling, whereas "No other dispatcher has been treated in this manner."

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193 (6th Cir. 1974); 6 Moore's Federal Practice 56.15 [1.-0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party. Curto v. Harper Woods, 954 F.2d 1237, 1241 (6th Cir. 1992); Wilson v. Zanesville, 954 F.2d 349, 350-351 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989).

14

AO 72A
(Rev. 8/82)

In Street v. J.C. Bradford & Co., supra, the Sixth Circuit Court of Appeals reviewed three then recent decisions of the United States Supreme Court addressing summary judgment practice, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).[4] The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". Id. at 1479-1480 (Footnotes and citations omitted.)

Under Title VII an employer may not discriminate against an individual with regard to "compensation, terms, conditions, or privileges of employment, because of such individual's....sex."

---

[4]After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

15

42 U.S.C. §2000e-2(a)(1).[5] Sexual discrimination includes sexual harassment which is sufficiently "severe or pervasive" so as to "'alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). Accord, Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993); Clark v. United Parcel Service, 400 F.3d 341, 351 (6th Cir. 2005); Valentine-Johnson v. Roche, 386 F.3d 800, 814 (6th Cir. 2004).

Ohio Revised Code Section 4112.02(A) provides that it is unlawful and discriminatory for an employer "because of the...sex...of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

An employee asserting wrongful gender-based discrimination premised upon hostile or offensive work environment must establish that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature; (3) the harassment was based upon sex; (4) the harassment unreasonably interfered with work performance and created an intimidating, hostile or offensive working environment; and (5) either that the harassment was committed by a supervisor or the employer, through its agents, knew or should have known of the charged sexual harassment and failed to promptly take appropriate action.[6] Abeita v. TransAmerica

---

[5] The Ohio Supreme Court has held that federal cases interpreting Title VII may also be applied to cases brought under the OCRA. Plumbers & Steamfitters Committee v. Ohio Civil Rights Commission, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981).

[6] In light of the fact that Ohio law parallels federal law regarding the elements of a hostile environment sexual harassment claim, the same analysis applies to claims brought under each of them. Hampel v. Food Ingredients Specialties, Inc., 89 Ohio St.3d 169, 175-177, 729 N.E.2d 726 (2000).

Mailings, 159 F.3d 246, 251, n.5 (6th Cir. 1998) (quoting Blankenship v. Park Care Centers, Inc., 123 F.3d 868, 872 (6th Cir. 1997)).

In order to establish actionable harassment, the conduct set forth by plaintiff must be evaluated by an objective and a subjective standard; a reasonable person would find the complained of conduct hostile or abusive and the plaintiff must subjectively perceive the complained of conduct to be abusive. Harris v. Forklift Systems, Inc., supra at 21-22; Williams v. General Motors Corp., 187 F.3d 553, 566 (6th Cir. 1999); Abeita v. TransAmerica Mailings, supra at 251. The degree of hostility and abusiveness is determined by considering the totality of the circumstances, which includes: (1) the frequency of the conduct; (2) the severity of the conduct (i.e., whether it is physically threatening or humiliating versus offensive comments); and (3) whether the conduct unreasonably interferes with an employee's work performance. Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir.), cert. denied, 118 S.Ct. 172 (1997) (citing Harris v. Forklift Systems, Inc., supra at 23). Accord, Valentine-Johnson v. Roche, supra at 814; Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000). Only ongoing harassment, as opposed to isolated or occasional conduct, is actionable as a hostile work environment. Clark v. United Parcel Service, supra at 351, citing Allen v. Michigan Department of Corrections, 165 F.3d 405, 411 (6th Cir. 1999).

Gender based harassment need not be sexual in nature provided that the conduct is based on "such sex-specific and derogatory terms...as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). "Harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. However, the harassment is not automatically discriminatory because of sex merely

17

because the words used have sexual content or connotations." Hampel v. Food Ingredients Specialties, Inc., supra at 180.

In Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), the United States Supreme Court reiterated that only extreme conduct could be actionable:

> Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."...A recurring point in these opinions is that "simple teasing"...offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."...These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."...Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."... "We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view."

(Citations omitted.) Thus, it follows that standing alone, a malicious or offensive denouncement does not rise to the level of a violation of Title VII. Harris v. Forklift Systems, Inc., supra at 21 (citing Meritor Savings Bank, FSB v. Vinson, supra at 67). That having been said, however, severe, pervasive, verbal conduct may rise to the level of a hostile work environment after considering the totality of the circumstances. Abeita v. TransAmerica Mailings, supra at 251 (quoting Black v. Zaring Homes, Inc., supra at 826).

When a prima facie showing of discrimination is made there is a rebuttable presumption that the employer has engaged in impermissible discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). At that point the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment decision.

18

McDonnell Douglas, 411 U.S. at 802; Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1214 (6th Cir. 1996).

Stated differently, that presumption may be rebutted by the production of evidence that "the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1982 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, supra at 254). Once the employer has met the foregoing burden of production the presumption of discriminatory animus is no longer in effect.

If there is negation of the presumption of discriminatory animus the factfinder is back to square one, and must determine whether the challenged employment action was motivated by discriminatory animus, taking into consideration all evidence of record, including any evidence indicating that the reason articulated by the employer for the action was pretextual. A plaintiff may accomplish this either by showing that the proffered reason is unworthy of belief, or that the true reason for the his/her rejection, notwithstanding the proffered reason, was of a discriminatory nature. Goostree v. Tennessee, 796 F.2d 854 (6th Cir. 1986), cert. denied, 480 U.S. 918 (1987).

> "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1982 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). *In order to challenge the credibility of an employer's explanation, the plaintiff must show by a preponderance of the evidence: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the adverse employment action; or (3) the proffered reasons were insufficient to motivate the adverse employment action.* See Manzer, 29 F.3d at 1084 (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993)).

19

E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 834 (6th Cir. 1997) (Italics added.)

Accord, Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 589 (6th Cir. 2002). Under the first

and third methods of demonstrating pretext, discrimination may be inferred from the circumstances,

but under the second method, the plaintiff is required to introduce some additional evidence of

discrimination. Id. at 589 (citing Kline v. TVA, 128 F.3d 337, 346 (6th Cir. 1997) and Reeves v.

Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)). The plaintiff always retains the

ultimate burden of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993);

Newman v. Federal Express Corp., 266 F.2d 401, 405 (6th Cir. 2001). When the foregoing issues

are raised upon motion for summary judgment the following applies:

> In the context of a summary judgment proceeding, [St. Mary's Honor
> Center v. Hicks, 509 U.S. 502 (1993)] requires that, once the
> employer has advanced a legitimate, nondiscriminatory basis for its
> adverse employment decision, the plaintiff, before becoming entitled
> to bring the case before the trier of fact, must show evidence
> sufficient for the factfinder reasonably to conclude that the
> employer's decision to discharge him or her was wrongfully based on
> [discrimination]. . ." Direct or indirect evidence of discriminatory
> motive may do but 'the evidence as a whole. . .must be sufficient for
> a reasonable factfinder to infer that the employer's decision was
> motivated by [discriminatory] animus.'". . .Thus, the plaintiff cannot
> avert summary judgment if the record is devoid of adequate direct or
> circumstantial evidence of discriminatory animus on the part of the
> employer.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993), cert. denied, 511 U.S. 1018

(1994). (Citations and footnotes omitted.) Accord, Manzer v. Diamond Shamrock Chemicals Co.,

supra at 1083, n.3.

Although disbelief of the employer's proffered reason for employment actions together with

the facts making up the prima facie case may suffice to show discrimination, "nothing in law would

20

permit [a court] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." St. Mary's Honor Center v. Hicks, supra at 514-15.

Turning to the present case there is no evidence offered by plaintiff that the alleged adverse employment actions, articulated by plaintiff as being the requirement that she seek psychological counseling as well as vision and hearing examinations, had anything to do with her gender. In fact, in arguing that she was "treated differently than other dispatchers," a proposition she supports with self-serving affidavit statements, plaintiff alludes to another female dispatcher who allegedly was not required to attend counseling despite her emotional outburst while on the job. Preferential treatment of another woman who was purportedly similarly-situated, even if true, could not evidence gender based discrimination against this plaintiff.

The record being devoid of any evidence that gender factored into the City's requirements that plaintiff seek psychological counseling as well as vision and hearing examinations, this Court concludes that she has failed to raise a genuine issue of material fact as to a prima facie case of sexual harassment/sexually hostile work environment, and that the defendants are entitled to summary judgment on those claims.

The same is true of plaintiff's claims of retaliation.

The purpose of Title VII's anti-retaliation provision is to protect employees from adverse action as a result of opposing that which is made unlawful by other sections of Title VII. In reviewing a retaliation claim courts apply the McDonnell-Douglas analysis. Wrenn v. Gould, 808 F.2d 493 (6th Cir. 1987). Under that mode of analysis a plaintiff bears the burden of showing: (1) that he/she engaged in an activity protected by Title VII; (2) that the defendant knew of the activity;

21

(3) that he/she was subject to an adverse employment action; and (4) that there is a causal connection between the protected activity and the adverse action. Singfield v. Akron Metro. Housing Authority, 389 F.3d 555, 563 (6th Cir. 2004); DiCarlo v. Potter, 358 F.3d 408, 420 (6th Cir. 2004); Wade v. Knoxville Utilities Board, 259 F.3d 452, 463 (6th Cir. 2001); Nguyen v. City of Cleveland, 229 F.3d 559, 563-64 (6th Cir. 2000); Johnson v. U.S. Dept. of Health and Human Services, 30 F.3d 45,47 (6th Cir. 1997). Such a causal connection can be shown by evidence that plaintiff was treated differently from other employees in similar circumstances. Singfield v. Akron Metro. Housing Authority, supra at 563.

If a plaintiff satisfies the foregoing burden of production, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. Texas Dep't of Community Affairs v. Burdine, supra. Having done so, the burden then shifts back to the plaintiff to show that the protected activity was a "significant factor" in the adverse action, meaning that it was one of the reasons for the adverse action. Wrenn v. Gould, supra.

This Court finds that plaintiff has failed to produce any evidence of a causal connection between her challenging the FTO pay and the City requiring her to seek counseling and to have vision and hearing examinations.

Plaintiff's position on this claim is that, immediately after challenging the FTO pay the City required her to seek counseling, have vision and hearing examinations, and disciplined her merely to retaliate against her, implying that there was no basis for the counseling, examinations, or discipline. This theory fails in light of the following evidence.

First, the City asserts, and provides documentation in support, that the problem behavior exhibited by plaintiff leading to the recommendation that she attend counseling began prior to the

22

time when plaintiff filed her Charge of Discrimination with the EEOC in late October of 2002. In fact, based on her behavior former Police Chief Dease recommended in September, 2002 that plaintiff be required to attend counseling, and she was formally referred to counseling at a meeting held on October 28, 2002, three days prior to the date upon which the Charge of Discrimination was stamped as having been received by the City (although permitted to be counseled by a therapist of her choice). While plaintiff states that she verbally informed the City that she had filed a Charge of Discrimination prior to October 31st there is no evidence that she did so other than her self-serving statement to that effect, which is unpersuasive.

There being no evidence that the conduct alleged to have been retaliatory occurred after the receipt of the Charge of Discrimination, this Court concludes that there is no evidence that the City knew of the protected activity when the plaintiff was formally referred to counseling.

Similarly, this Court finds no evidence that the City's actions regarding the plaintiff's hearing and/or vision were retaliatory.

In order to demonstrate an adverse employment action a plaintiff must provide evidence of a "materially adverse change in the terms or conditions of employment." Dobbs-Weinstein v. Vanderbilt University, 185 F.3d 542, 544 (6th Cir. 1999), cert. denied, 529 U.S. 1019 (2000), citing Kocsis v. Multi-Care Management, Inc., 97 F.3d 876 (6th Cir. 1996). To be material, any such change in working conditions must have been "more disruptive than a mere inconvenience or an alteration of job responsibilities." Kocsis, supra at 886, (quoting Crady v. Liberty National Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). Employment actions considered to be de minimis cannot be materially adverse and, therefore, cannot be actionable. Bowman v. Shawnee State University, 220 F.3d 456, 462 (6th Cir. 2000). Termination from employment, demotion, decrease in salary or title,

loss of benefits, or diminished responsibilities evidence materially adverse employment actions, but lowered performance ratings with no effect on wages does not. Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). A "counseling memoranda" disciplining an employee was not a materially adverse employment action, Allen v. Michigan Department of Corrections, 165 F.3d 405 (6th Cir. 1999), nor was a reprimand with no suspension, loss of pay or benefits, or change of duties, Reid v. Madison County, 173 F.3d 856 (6th Cir. 1999). It follows that one's "bruised ego" will not constitute an adverse employment action. White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting Kocsis, supra at 886).

The record reflects that initial testing confirmed Safety Director Von Duhn's concerns that plaintiff suffered hearing loss and vision problems, the latter of which was surgically corrected. The fact that eventually, after further testing, the City agreed that use of hearing aids would not be continued as a condition of employment does not constitute evidence that requiring her to do so in the first instance based upon other medical advice was in any way improper. Indeed, this Court cannot disregard the fact that after the initial hearing testing the plaintiff requested that, as a reasonable accommodation, she be provided with hearing aids at the City's expense, that the City acceded to that request and that it was only after the plaintiff balked at continued use that the matter came to a head.

Plaintiff further alludes to the fact that disciplinary actions were taken against her as evidence of retaliation.

Although the City issued verbal and written reprimands to the plaintiff in 2003 and 2004, there is no evidence that they were accompanied by time off, suspension, loss of pay or benefits, change in duties, or any other significant. Without such evidence, those reprimands would not

24

AO 72A
(Rev. 8/82)

amount to materially adverse employment actions.

As for the dates in June and July of 2004 when she was sent home as unfit for duty for failing to wear the hearing aids, there is no evidence that the discipline was motivated by anything other than plaintiff's failure to wear the hearing aids, which had been provided to her consequent to her request for accommodation, despite the fact that she had been instructed to do so by her supervisor and that she had them in her purse. Absent such a causal connection between the protected activity and the adverse action, the fourth element of a prima facie case of retaliation cannot be met.

There being no direct evidence or evidence supporting a prima facie case of retaliation, summary judgment is also warranted on that issue.

The plaintiff having failed to offer direct evidence or to establish a prima facie case for the discrimination alleged, she has failed to meet her burden of production and, therefore, there is no reason to further address the City's legitimate, non-discriminatory reasons for the actions taken or to address the issue of pretext.[7]

In light of all the foregoing, summary judgment will be entered in defendant's favor.

DAVID S. PERELMAN
United States Magistrate Judge

DATE:   October 17, 2005

---

[7]If this Court was to do so it would find in the City's favor on each of these issues.

25